AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)        ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT
2/6/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KM _____ DEPTUTY

**FILED**
CLERK, U.S. DISTRICT COURT
2/6/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ts _____ DEPUTY

United States of America,

    Plaintiff,

    v.

JEREMY GIL,

    Defendant.

Case No.   2:26-mj-00708-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or between the date(s) of November 1, 2025 and December 18, 2025, in the county of Los Angeles in the

Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 2251(a), (e) | Production of Child Pornography |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Celina M. Gasparian*
_____
*Complainant's signature*

Celina M. Gasparian, DHS Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        02/06/2026
_____
*Judge's signature*

City and state:   Los Angeles, California        Hon. Stephanie Christensen, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA(s): Kenneth R. Carbajal(x3172)

## **AFFIDAVIT**

I, Celina Gasparian, being duly sworn, declare and state as follows:

### I.   **INTRODUCTION**

1.   I am a Special Agent ("SA") with the Department of Homeland Security, Homeland Security Investigations ("HSI"), and have been so employed since October 2019.

### II. **PURPOSE OF AFFIDAVIT**

2.   This affidavit is made in support of criminal complaint against, and arrest warrant for, Jeremy GIL ("GIL") for violations of 18 U.S.C. § 2251(a), (e) (production of child pornography)("the SUBJECT OFFENSE").

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. **BACKGROUND OF SPECIAL AGENT CELINA GASPARIAN**

4.   I have been employed as a Special Agent ("SA") of the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI"), since October 2019, and am currently

assigned to the Child Exploitation Task Force, where I investigate criminal violations relating to child exploitation and child pornography, illegal production, distribution, receipt and possession of child pornography, in violation of 18 U.S.C. § 2252A, among other violations.  While employed by HSI, I have investigated federal criminal violations related to high technology or cybercrime, child exploitation, and child pornography.  I have gained experience through training and everyday work relating to conducting these types of investigations.  I have received training in the domain of child pornography and child exploitation and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media. Prior to my employment with HSI, I was a Clinical Psychologist with the Federal Bureau of Prisons (BOP) for approximately two years, at which time I worked predominately with the sex offender inmate population.  In 2016, I obtained my Doctor of Philosophy Degree in Clinical Psychology from the California School of Professional Psychology. Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2251, 2252, 2252A, 2242, and 2243, and I am authorized by law to request an arrest warrant.

## IV.   BACKGROUND ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE INTERNET, AND DEFINITION OF TERMS

5.    In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.  The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

6.    Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

a.    Computers and Child Pornography.  Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

b.    File Storage.  Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage").  Computer users

3

frequently transfer files from one location to another, such as from a phone to a computer or from cloud storage to an external hard drive.  Computer users also often create "backup," or duplicate, copies of their files.  In this way, digital child pornography is extremely mobile and such digital files are easily reproduced and transported.  For example, with the click of a button, images and videos containing child pornography can be put onto external hard drives small enough to fit onto a keychain.  Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets.  Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device.  Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

c.   Internet.  The term "Internet" is defined as the worldwide network of computers – a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of tens of thousands of computer networks, online services, and single user components.  In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

4

d.   <u>Internet Service Providers</u>.  Individuals and businesses obtain access to the Internet through ISPs.  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP.  ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them.  Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

e.   <u>IP Addresses</u>.  An Internet Protocol address ("IP Address") is a unique numeric address used to connect to the Internet.  An Ipv4 IP Address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP.  What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example.  Because the home subscriber typically only has one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are connected to

5

the Internet via a router or hub.  Internet activity from every device attached to the router or hub is utilizing the same external IP Address assigned by the ISP.  The router or hub "routes" Internet traffic so that it reaches the proper device.  Most ISPs control a range of IP Addresses.  The IP Address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP Address is only assigned for the duration of that online session.  Most ISPs maintain records of which subscriber was assigned which IP Address during an online session.

     f.   IP Address – Ipv6.  Due to the limited number of available Ipv4 IP addresses, a new protocol was established using the hexadecimal system to increase the number of unique IP addresses.  An Ipv6 consists of eight sets of combination of four numbers 0-9 and/or letters A through F.  An example of an Ipv6 IP address is 2001:0db8:0000:0000:0000:ff00:0042:8329.

     g.   The following definitions:

     i.   "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

     ii.   "Chat room," as used herein, refers to the ability of individuals to meet in one location on the Internet in order to communicate electronically in real-time to other

6

individuals. Individuals may also have the ability to transmit links to electronic files to other individuals within the chat room.

iii. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

iv.  "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where: (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

v.  "Cloud-based storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet. Users of such a service can share links and associated passwords to their stored files with other traders of child

pornography in order to grant access to their collections. Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop and laptop computers, mobile phones, and tablets, anywhere and at any time. An individual with the password to a file stored on a cloud-based service does not need to be a user of the service to access the file. Access is typically free and readily available to anyone who has an Internet connection.

vi.   "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

vii. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related

8

communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

viii.    "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

ix.   "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

x.    "Encryption" is the process of converting data into a code in order to prevent unauthorized access to the data.

9

xi.   The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

xii. "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

xiii.   An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers ("ISPs") control a range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

10

xiv. "Log files" are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

xv.  "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

xvi. "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

xvii.    "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

xviii.    "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

11

xix. "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

xx.   A "storage medium" or "storage device" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

xxi. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

xxii.    A "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

## V.  SUMMARY OF PROBABLE CAUSE

7.   On December 18, 2025, Homeland Security Investigation agents in Detroit ("HSI Detroit") developed an investigative

12

lead generated from an undercover "chat" between an unknown Kik[1] user, and an HSI Detroit SA who was communicating in an undercover capacity on the Kik platform.

8.    The HSI SA was communicating with Kik user IhateU23 ("IhateU23 Account"). The HSI Detroit SA received what appeared to be child pornography from the IhateU23 Account. The IhateU23 Account user stated one of the images was a depiction of him and his six-year-old son. The image included an adult male, seated, masturbating his penis, with a prepubescent minor standing directly in front of the adult male, naked from the waist down, with his back turned toward the adult male, exposing his buttocks.

9.    HSI Detroit issued legal process to Kik and Charter Communications, Inc. and received a return indicating the account was associated with 856 Elm Avenue, Long Beach, California 90813 (the "Elm Avenue Residence"). Investigative efforts indicated a male with identifiers similar to those of the IhateU23 Account user, with an approximately six-year-old son, resides at the Elm Avenue Residence. Law enforcement identified the individual as Jeremy Joshua GIL.

10.   On February 6, 2026, I interviewed GIL.  During this interview, GIL admitted that he recorded himself engaging in sexual conduct with his minor son on multiple occasions.  Also, on this date, I observed the bathroom at the Elm Avenue Residence and it appeared to be the same bathroom depicted in a

---

[1]    Kik Messenger is an online chat platform that enables users to chat directly or in groups using text or chatbots.

13

video that GIL recorded, and distributed, of his minor son rubbing GIL's penis.

## VI. <u>STATEMENT OF PROBABLE CAUSE</u>

11.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I know the following:

### A.   On December 18, 2025, HSI Detroit SA and IhateU23 Account User "chatted" on the Kik Platform

12.  The HSI Detroit undercover SA ("UCA") was portraying themselves as the father of an eight-year-old girl. The UCA was a member of a Kik group: "#beasagcs (dispaly name: 2-16 yo (emoji) H@RDCOR...)."

13.  On December 18, 2025, the UCA sent a message in the Kik group asking if anyone was "into kids." The IhateU23 Account user sent an emoji of a hand waving indicating their interest. At this time the UCA engaged in a private conversation with the IhateU23 Account user through a direct message feature within the Kik platform. The UCA provided a screen recording of the following conversation that occurred between the UCA and the IhateU23 Account user:

UCA: What ages

IhateU23 Account: Smaller the better

UCA: Mmmmm

UCA: Any experience

IhateU23 Account: And you?

14

UCA: Active w daughter

IhateU23 Account: Nice I've tried a little with my son but that's it

UCA: Mmm what's a little

IhateU23 Account: Showered naked and let him touch me

UCA: Mmmm

IhateU23 Account: That's about all we have tried

UCA: Let's see him

IhateU23 Account: Maybe just a little hesitant

UCA: Nah I gotcha

UCA: I'll show you my girl after

IhateU23 Account: What do you want to see

UCA: Young (emoji)"

14.   Following this conversation, the IhateU23 Account sent an image of an adult male, seated on a red seat, masturbating his uncircumcised penis. Standing in front of the adult male is what appears to be a prepubescent minor with their back toward the adult male, naked from the waist down, exposing their buttocks ("IMAGE 1"). The UCA and IhateU23 Account user then had the following conversation:

UCA: Mmmm wow your boy?

IhateU23 Account: Yes

UCA: Damn how long ago

UCA: And how old is he

IhateU23 Account: A while not sure

IhateU23 Account: 6

UCA: Mmmm what did you do after (emoji)

15

IhateU23 Account: Nothing just jacked off with him naked there

UCA: (emoji) he have any idea

IhateU23 Account: Yeah he did

IhateU23 Account: Wish I had a daughter tho

UCA: You take vid?? Or just pics

IhateU23 Account: Just pics

UCA: How dirty your stuff get

15.  Following this conversation, the UCA sent an undercover agent photo of what appears to be a minor female, meant to the UCA's "daughter." The UCA and IhateU23 Account user then had the following conversation:

IhateU23 Account: She's cute

UCA: Ty (emoji)

IhateU23 Account: I'd love to see more of her

UCA: Whatcha wanna see

IhateU23 Account: Anything you feel comfortable sharing

UCA: Well how dirty does your stuff get lol

IhateU23 Account: Kinda dirty lol

UCA: Try me haha mines kinda dirty too

IhateU23 Account: I'd love to see

UCA: After you of course (emoji)

At this time the UCA sent an image of children's underwear that appears to be soiled

16.  Following this conversation, the IhateU23 Account user sent a video ("VIDEO 1") of what appears to be a prepubescent minor victim, approximately five to seven years old, in the

16

shower with an adult male. The adult male has an uncircumcised penis, similar to the one depicted in IMAGE 1. The adult male is masturbating his penis, and the minor victim takes the adult male's penis into his/her hands and rubs his/her hands on the penis. Shortly after, the adult male ejaculates while the minor victim is still holding onto, and touching, the adult male's penis. Of note, the adult male in the video appears to have painted/polished toenails, and the minor victim has chest-length curly, dark-brown hair.

**B.    Kik and Charter Communications, Inc. Documentation Indicate the IhateU23 Account is Associated with the Elm Avenue Residence**

17.  In response to an emergency disclosure request to Kik for subscriber information for the IhateU23 Account, Kik provided the following information:

Date: December 18, 2025

First Name: Jay

Last Name: Gee

Email: jeremygil16@gmail.com

Username: IhateU23

2025/12/09 01:33:56 UTC "ip":"35.149.53.98", "Port":"51322",

2025/12/17 02:55:21 UTC "ip":"35.149.53.98", "Port":"52935",

18.  Open-source checks indicated the IP addresses provided by the Kik emergency disclosure are carried by Charter Communications, Inc. Subsequent legal process to Charter Communications, Inc. provided the following information:

Subscriber Name: Maria Marquez

Service Address: 856 Elm Ave, Long Beach, CA 90813

Billing Address: 856 Elm Ave, Long Beach, CA 90813

User Name or Features: m.marquez6174@yahoo.com,

5623132520@charter.net

Phone Number: 562-841-8209, 323-403-6273

19.  Upon searching law enforcement databases, law enforcement discovered that GIL's registered address with the California Department of Motor Vehicle's is the same as the Elm Avenue Residence. Furthermore, the name "Jeremy GIL" matches the name used on the Gmail account of the Kik IhateU23 Account subscriber information: jeremygil16@gmail.com.

20.  Additionally, GIL is referenced in a Long Beach Police Department ("LBPD") report regarding a report of suspected child abuse on February 24, 2025. The report described an incident in which LBPD was dispatched to Los Angeles Children's Hospital following a social worker reporting an incident of suspected child abuse. The child's mother, M.M., brought her son to the hospital reporting he appeared to be in pain and she was concerned. The minor child in the report was four years old at the time and had a diagnosis of cerebral palsy and was found to have a broken femur. Ultimately the attending physician reported the injury was consistent and typical for children with cerebral palsy.

21.  The police report indicated the father of the minor was GIL and listed his (and M.M.)'s residence as Elm Avenue Residence. The report also indicated the couple had two children living at the Elm Avenue Residence.

18

**C.    HSI Special Agent Observes GIL at the Elm Avenue Residence**

22.  On February 3, 2026, SA Joseph DeLuca and I conducted physical surveillance at the Elm Avenue Residence. At approximately 2:53 P.M., I observed a vehicle bearing license plate ending in -097 drive up and park in front of the Elm Avenue Residence. A man and woman matching the likeness of GIL and M.M. exited the vehicle. GIL was observed holding a male minor who appeared to be smaller in stature than the potential victim in VIDEO 1.  This appears to be the child with the cerebral palsy diagnosis. According to the LBPD report, a second male child resides at the Elm Avenue Residence who is also the child of GIL and M.M., and is believed to be the victim depicted in the child sexual abuse material.

 

23.  At approximately 3:28 P.M. a yellow school bus approached the Elm Avenue Residence. A woman believed to be M.M. exited the building in which the Elm Avenue Residence is located, went inside the school bus, and exited the school bus with a minor male appearing to match the likeness of the minor victim in VIDEO 1, due in part to similar hair length and color (hereinafter "MINOR VICTIM").



**D.    GIL Confesses to HSI Special Agents Regarding the Sexual Abuse of his Son**

24.  On February 5, 2026, the Honorable Michael Kaufman issued search warrant No. 2:26-mj-00669 for the search of the Elm Avenue Residence. On February 6, 2026, upon executing the search warrant, SAs Gasparian and DeLuca engaged in a post-Miranda interview with GIL. GIL waived his rights prior to the commencement of the interview.

20

25. During the interview, GIL confessed to the following:

    a.    GIL reported he engaged in the acts shown in VIDEO 1 at least twice, including placing the MINOR VICTIM's hands on GIL's penis and forcing the MINOR VICTIM to masturbate GIL until GIL ejaculated. GIL indicated that he recorded the conduct depicted in VIDEO 1 on his cellphone and that it took place in the bathroom of the Elm Avenue Residence sometime in November or December 2025.

    b.    GIL also described a separate incident, which involved the activity depicted in IMAGE 1. GIL said he sat down in the living room/sleeping space of the Elm Avenue Residence, masturbated, and put the MINOR VICTIM's hand/s on GIL's penis and forced the victim to masturbate GIL. GIL reported he has done this more than once. GIL reported that the 5-year-old son with cerebral palsy was in the same living area when this occurred.

    c.    GIL reported he is in, and has participated in, social media platform groups dedicated to child pornography.

    d.    GIL reported he has received child pornography on social media applications before.

    e.    GIL reported he uses Instagram to search for predominately child erotica, specifically that of young females.

    f.    GIL reported his wife, M.M., is aware of his sexual abuse of the MINOR VICTIM. GIL reportedly told M.M. of this abuse sometime between November 2025 and December 2025. GIL reported he showed M.M. VIDEO 1.

21

26.   GIL attempted to lie at the outset of the interview; however, when presented with evidence to include images of himself with the victim, he admitted to being the subject in both IMAGE 1 and VIDEO 1.

**E.    Evidence Collected and Observed at the Elm Avenue Residence Matches CSAM Content**

27.   During the execution of the residential search warrant of the Elm Avenue Residence, various items of evidence were collected. One such piece of evidence was a dress worn in the profile picture of the IhateU23 account. I have included a screenshot of the IhateU23 account and a photograph of the dress recovered from the Elm Avenue Residence below, for comparison:

 

28.   Additionally, evidence photos were taken of the shower at the Elm Avenue Residence, which matched the shower depicted in VIDEO 1. I have included a screenshot of VIDEO 1 and a photograph of the shower at the Elm Avenue Residence below, for comparison:




29.   Lastly, the flooring and bedding depicted in IMAGE 1 matched the flooring and bedding found in the Elm Avenue Residence. I have included a portion of IMAGE 1 and a photograph taken at the Elm Avenue Residence below, for comparison:

 

## VII. <u>CONCLUSION</u>

30.  For all the reasons described above, there is probable cause to believe to believe that GIL has committed violations of 18 U.S.C. § 2251(a), (e) (production of child pornography) ("the SUBJECT OFFENSE").

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 6th day of February, 2026.

_____
HON. STEPHANIE S. CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE

24